## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CASE NO. 4:23-CR-159-03 |
| v. | : | |
| | : | (C.J. BRANN) |
| DENISE LODGE, | : | |
| Defendant | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

## I.    INTRODUCTION

Defendant Denise Lodge ("Lodge") trafficked in human body parts that her husband stole from the morgue where he worked.  In the best position to stop her husband from engaging in this heinous criminal conduct, she became his assistant.  She treated the bodies of human beings as if they were baubles to be sold for profit.  Denise Lodge's conduct shocks the conscience.

The Sentencing Guidelines which apply here – written as if they would be used to punish the trafficking of mere baubles – simply do not account for the egregiousness of this type of crime, and the range they yield in Lodge's case is insufficient to achieve a just sentence.

1

Accordingly, the United States respectfully requests that the Court vary upward from the Guidelines range and impose a sentence of imprisonment of 12 months.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

Between in or about 2018 through at least in or about March 2020, Denise Lodge participated in the sale and interstate shipment of human remains stolen from the Harvard Medical School morgue, located in Boston, Massachusetts.  During that period, Lodge's husband, Cedric Lodge, was employed by Harvard as the morgue Manager.

Cedric Lodge would remove human remains, including organs, brains, skin, hands, faces, dissected heads, and other parts, from donated cadavers after they had been used for research and teaching purposes but before they could be disposed of according to the anatomical gift donation agreement between the donor and the school. Typically, a donor would elect to have their remains either returned to a designee or next of kin as-is for disposition, cremated and have the cremains returned to a designee or next of kin, or cremated and buried in a memorial plot maintained by Harvard.  Cedric Lodge would remove portions of some donated cadavers before they were cremated or

returned without the knowledge or permission of his employer, the donor, or the donor's family.

Cedric Lodge also stole and sold other property from Harvard Medical School, including specimen cases bearing an "HMS" logo.

Cedric and Denise Lodge resided in New Hampshire. Denise Lodge communicated with individuals, including Andrew Ensanian, a resident of the Middle District of Pennsylvania, and Joshua Taylor, a resident in the Eastern District of Pennsylvania, online, including through Facebook, and negotiated sales of stolen remains to them. After agreeing on a price, payment was sent, frequently by PayPal to an account registered to Denise Lodge, and Denise Lodge would ship the remains from New Hampshire to Pennsylvania.

For example, in May 2018, Denise Lodge shipped Ensanian 24 hands, 2 feet, 9 spines, a partial skull, and 2 skull caps in exchange for $3050. In February 2019, Denise Lodge shipped Ensanian a dissected head, which she told Ensanian came from a medical school, in exchange for $1150, and another head two days later for $575. In March 2019, Denise Lodge sent Ensanian five dissected human faces in exchange for

3

$2300, after a conversation in which Denise Lodge indicated that her husband had set the price.

Denise Lodge also communicated with Joshua Taylor about sales of stolen human remains, and between September 2018 and July 2021, Taylor sent Denise Lodge's PayPal account over $37,000. The Lodges also sold stolen human remains to Katrina MacLean, a resident of Salem, Massachusetts. MacLean and Taylor also, at times, paid Cedric Lodge in cash.

Ensanian, MacLean, and Taylor, all sold many, if not all, of the remains purchased from the Lodges for profit, including to Jeremy Pauley, a resident of the Middle District of Pennsylvania. Pauley, in turn, also sold many of those items for a profit.

In March 2023, FBI agents executed a search warrant at the Lodges' residence, and seized, among other items, electronic devices, records, communications from Joshua Taylor, mortuary instruments, and a human skull.

On June 13, 2023, a five-count Indictment was filed in the Middle District of Pennsylvania against Cedric Lodge, charging him with

4

Conspiracy to Commit Interstate Transportation of Stolen Goods and Interstate Transportation of Stolen Goods in violation of 18 U.S.C. §§ 371 and 2314.  Doc. 1.

On April 12, 2024, Lodge pled guilty to Count 5 of the Indictment pursuant to a plea agreement with the government.  PSR ¶ 4.

## III.  PROCEDURE

Pursuant to *United States v. Booker*, 543 U.S. 220 (2005), which rendered the United States Sentencing Commission Guidelines Manual ("USSG") advisory, the Court of Appeals set forth a three-step process when imposing a sentence:

1. Courts must continue to calculate a defendant's USSG sentence, regardless of *Booker*;

2. In doing so, they must formally rule on the motions of both parties, state on the record whether the Court is granting a departure and how that departure affects the USSG calculation, and consider pre-*Booker* case law, which continues to have advisory force; and

3. Courts are required to exercise their discretion by considering the relevant factors set forth in Title 18, United States Code,

5

Section 3553(a), when imposing a sentence, regardless of whether it varies from the sentence calculated under the USSG.

*United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006).

As of November 1, 2025, the Sentencing Commission simplified the Guidelines by removing step two of the three-step sentencing process. As amended, the Guidelines now provide a two-step sentencing process. This amendment removed most of the departures previously provided throughout the Guidelines Manual, including the upward departures previously recommended in related cases under USSG §5K2.8. Extreme Conduct and USSG §5K2.0(a)(2) for aggravating factors not adequately considered by the sentencing guidelines.

The United States will address the request for a 12-month sentence as an upward variance necessary to achieve the § 3553(a) factors.

### A. Sentencing Guidelines Calculation

The government recommends a total offense level of 4 and Criminal History Category of I for an advisory range of 0 to 6 months of

6

imprisonment and anticipates that will be the advisory range determined at sentencing.

The United States acknowledges the Court's Memorandum and Opinion of August 24, 2024, in *United States v. Pauley*, 4:23-CR-163, regarding the issue of loss in view of *United States v. Banks,* 55F.4th 246, 256 (3d Cir. 2022), but incorporates the arguments set forth in its Brief in Opposition filed in that case (Doc. 35) and formally objects to Paragraph 30 of the PSR.  Had the loss calculation been included, the offense level would have increased by six levels under §2B1.1(b)(1) of the Guidelines.

The defense objects to the application of enhancements pursuant to §2B1.1(b)(2)(A)(ii) for mass-marketing and §2B1.1(b)(4) for being in the business of selling stolen property. The United States stands by U.S. Probation's assessment in applying the enhancements.

Section 2B1.1(b)(2)(A)(ii) assesses a two-point enhancement on the offense level where the offense "was committed through mass-marketing."  As the Third Circuit has now held, unless the Guideline's text is ambiguous and the comment provides clarity, the text alone

controls. *See United States v. Chandler*, 104 F.4th 445, 450 (3d Cir. 2024) (citing *United States v. Nasir*, 17 F4th 459, 471 (3d Cir. 2021). The text does not appear to be ambiguous. It simply asks a court to consider whether the offense – here the interstate transport of stolen body parts – was committed through marketing those goods to the masses.

In the instant offense, the defendant and the defendant's husband publicly advertised stolen human remains for sale on Facebook, a website with millions of users – and in groups with thousands of interested potential buyers.  It was through these platforms that the defendant and her husband forged relationships with multiple buyers, to include Andrew Ensanian and Joshua Taylor. Those relationships gave rise to the trafficking of additional human remains at a profit to the Lodges of over $40,000. The text of the guideline is unambiguous. The facts are clear. The enhancement is appropriately applied.

The defendant also takes issue with the application of §2B1.1(b)(4), arguing that it is not applicable to codefendants who sell merchandise that another coconspirator stole.  The enhancement reads,

"If the offense involved receiving stolen property, and the defendant was a person in the business of receiving and selling stolen property, increase by 2 levels."  USSG §2B1.1(b)(4).  In this case, Denise Lodge received the remains that her husband stole from the Harvard morgue. She then engaged in price negotiations before shipping the remains to buyers and accepting payment.  She received and sold stolen property. The enhancement is properly applied.

With the application of those enhancements, the United States recommends a total offense level of 4, yielding an advisory range of 0 to 6 months of imprisonment.  As discussed more fully below, that remarkably low advisory guideline range in this case fails to reflect the egregious nature of the criminal conduct at issue.  As such, the United States asks that this Court vary above the otherwise applicable guidelines range and impose a term of imprisonment of 12 months.[1]

### B. Factors In Support of an Upward Variance

The government makes this request for a number of reasons.

---

[1] An upward variance of six levels results in an advisory guidelines range of 6 to 12 months.

First, Lodge's conduct was unusually heinous, cruel, and degrading. While this case is unique, it is not singular. Similar cases prosecuted across the country have led to significant sentences of imprisonment.

Second, other provisions of the Guidelines also point toward justice requiring that this Court impose a sentence above the 0 to 6 month range.

Finally, the sentence must account for the grave suffering that Lodge has caused to hundreds of grieving families.

### (1) The Unusually Heinous Sale of Human Remains

First, the nature of this crime is incredibly heinous as compared to a run-of-the-mill interstate transportation of stolen goods case typically sentenced under the Guidelines. While departures are stylized as variances as of November 1, 2025, the *Queensborough* Court's reasoning in granting an upward departure remains persuasive. "Before a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases in the Guideline. . . . Whether a given factor is present to a degree not adequately considered by the Commission, or whether a

10

discouraged factor nonetheless justifies departure because it is present in some unusual or exceptional way, are matters determined in large part by comparison with the facts of other Guideline cases." *United States v. Queensborough*, 227 F.3d 149, 162 (3d Cir. 2000), quoting *Koon v. United States*, 518 U.S. 81, 98 (1996). *See also*, United *States v. Bull*, 828 F.3d 735, 739 (8d Cir. 2016) (upward departure warranted where conduct is "outside the heartland" of the typical case of its kind).

Nothing in § 2B1.1 accounts for the theft and sale of stolen human remains. In a "heartland" theft case, the Court is dealing with things – cars, tires, art. A Court need not address or contemplate the emotional toll of a victim whose grief over losing a parent is compounded by the theft and exploitation of his mortal remains. Nor do the Guidelines account for circumstances where the theft and ensuing interstate transportation violate the dignity of the deceased.

Lodge and other individuals involved in the theft and interstate trade of human remains engaged in conduct far more egregious than the typical stolen goods case. Indeed, were it not for their actions in commodifying and profiting from the sale of stolen body parts, one might be reluctant to classify such remains as "goods" at all. But the

11

Lodges sold parts of cadavers and turned them into "stock," selling pieces of deceased people, advertising her husband's dark wares and creating a marketplace for this appalling trade.

In one example, Denise Lodge sold a man's face – perhaps to be kept on a shelf, perhaps to be used for something even more disturbing. What an impossible reality with which families must now grapple.

### a. Other cases involving human remains

While analogous prosecutions have been infrequent, there have been federal prosecutions of individuals engaged in the trafficking of stolen body parts, fraudulent sale of human remains, and fraudulent actions related to human remains.  Each time, forced to craft sentences for such heinous conduct, Courts have sentenced defendants to lengthy terms of imprisonment, often well above the advisory guideline ranges.

In *United States v. Rathburn, et al.*, the main defendant, Arthur Rathburn, who operated a medical corporation, was convicted at trial of seven counts of wire fraud and transportation of hazardous materials for defrauding buyers of cadavers donated for science. 771 Fed.Appx. 614 (6th Cir. 2019).  Rathburn was sentenced to 108 months'

imprisonment on the wire fraud charges.[2]  Rathburn's wife and co-defendant, testified at trial. She pled guilty and was sentenced to 24 months' probation. *Id*.[3]

In *United States v. Hess, et al.*, No. 1:20-CR-98, funeral home operators Megan Hess and Shirley Koch, each pleaded guilty to wire fraud and aiding and abetting for their role in a scheme to illegally sell body parts or entire bodies for body broker services in the District of Colorado.[4]

Hess was sentenced *twice* to 240 months' imprisonment and Koch was sentenced *twice* to 180 months' imprisonment. The case was remanded by the Tenth Circuit Court of Appeals based on errors in calculating the loss amount and in its findings concerning several enhancements. The Court imposed the same sentences on April 24,

---

[2] Rathburn's guidelines were calculated as 135-168 months. The Government recommended a sentence of 168 months. Government's Memorandum in Aid of Sentencing, *United States v. Rathburn*, 2018 WL 2474003 (E.D.Mich. May 9, 2018).

[3] Sentencing information available at https://www.oig.dot.gov/library-item/36412, last visited Dec. 9, 2025.

[4] Case described at https://www.justice.gov/usao-co/pr/sunset-mesa-funeral-home-operators-sentenced-federal-prison-illegal-body-part-scheme, last visited Dec. 9, 2025.

2025, and August 27, 2025.  *See United States v. Hess*, 106 F.4th 1011 (10th Cir. 2024); *see also* Government Exhibit 1.

The defendants in both *Hess* and *Rathburn* were involved in schemes to sell body parts to body brokers for purposes of medical research or were selling infected or diseased parts for the same purpose. The facts of this case are worse.  Here, the defendant was selling stolen human remains knowing they would be sold and then either kept in a collection, sold, or displayed at "oddities" events.

In a case arising from this investigation, *United States v. Candace Chapman-Scott*, 4:23-CR-101, prosecuted in the Eastern District of Arkansas, the Court sentenced the defendant to the government's recommended 180 months.[5]  https://www.justice.gov/usao-edar/pr/little-rock-woman-sentenced-15-years-federal-prison-after-transporting-stolen-human.  Chapman-Scott, working as an apprentice mortician at a cremation business, repeatedly stole human remains, including the bodies of two stillborn babies, and trafficked them for

---

[5] The advisory guidelines range appeared to be 10 to 16 months. *United States v. Candace Chapman-Scott*, 4:23-CR-101, Doc. 61, p. 2.

14

profit to Jeremy Pauley.  She did so with full knowledge that Pauley
intended to "plastinate" or otherwise preserve them for display, or, in
the case of pieces of skin, "tan" them to bind books. *United States v.*
*Candace Chapman-Scott*, 4:23-CR-101, *Doc. 61, p. 5.*

Most recently, in *United States v. Hallford*, 1:24-CR-113, in the
District of Colorado, the Court imposed a 240-month sentence after
refusing to accept an 11(c)(1)(C) agreement that capped the sentence at
180 months.[6] Doc. 88, p. 1.   In that case, a funeral home director, Jon
Hallford, accepted payment from families for attending to the bodies of
their loved ones while actually allowing 190 bodies to rot and decay in
the funeral home contrary to the wishes of the families and terms of the
victims' funeral contracts, providing decedent's family members with
dry concrete mix instead of actual cremains.  Doc. 88, p. 13.   The
Lodges have left the donor families in this case to be haunted in the
same way as the victim families in *Hallford*.

---

[6] The advisory guidelines range appeared to be 78 to 97 months. *United*
*States v. Hallford*, 1:24-CR-113, Doc. 88, p. 2; sentencing information
available at https://www.justice.gov/usao-co/pr/colorado-springs-funeral-
home-operator-sentenced-gruesome-fraud-scheme, last visited Dec. 9,
2025.

b. Analogous Guidelines provisions

The United States notes that this Court already observed, "[t]he law does not always align with what one may believe is right, just, or fair" in determining that the loss enhancement under §2B1.1(b)(1) would not apply to these offenses. *United States v. Pauley*, 4:23-CR-163, Doc. 40, p. 1 (quoting *Reiner v. Northumberland Cnty.*, No. 4:24-CV-00493, 2024 WL 2216852, at *1 (M.D. Pa. May 15, 2024).  But where a portion of the Guidelines may not directly control the advisory range or legally apply, as the Court has determined concerning the loss at issue here, courts *are* permitted to use analogous guidelines in support of a departure or variance.  *United States v. Larkin*, 629 F.3d 177, 193-194 (affirming a five-level departure based on analogizing to a guideline enhancement not applicable to the offense).

The Court should consider the following guidelines in crafting an upward variance.

First, the United States suggests that justice requires an upward variance of six levels to account for Lodge's monetary gains. *See* USSG §2B1.1(b)(1).  In fact, Denise Lodge agreed that such an enhancement was appropriate in her plea agreement. PSR ¶4.

16

Moreover, the Court should take the opportunity to acknowledge the other challenges of this case vis a vis portions of the Guidelines. The loss suffered by the donors' families is real and substantial, but not economic as required by the Guidelines to result in certain enhancements. Yet, in a fraud where 25 or more victims suffered substantial financial hardship, the offense would be increased by 6 levels. *See* USSG §2B1.1(b)(2)(C). Here, more than 25 families suffered substantial and ongoing emotional hardship after Lodge put a price on something priceless. A 6-level enhancement by analogy for *that* substantial harm is reasonable.

Moreover, the donors were *people*, but the economic statute of conviction does not implicate the serious enhancements crafted to account for the trafficking of *people*. Alien smuggling offers insight. There, where a defendant treats more than 100 persons as commodities to be moved and traded, a defendant faces a 9-level enhancement. S*ee* § 2L1.1(b)(2)(C). An upward variance for the vast number of victims would be reasonable.

Paragraph 33 of the PSR reads **Victim Related Adjustment**: None. That is legally correct. And yet, it is hard to reasonably conclude that the donors were not the Lodges' victims. It is hard to argue that the donors were not vulnerable. In an offense involving a large number of vulnerable victims, a defendant faces a 4-level enhancement. With those factors in mind, an upward variance would be reasonable.

3.   <u>The Ongoing Harm to Donors and Their Families</u>

Before turning to family members, the United States first acknowledges the victimization of the individuals from whom parts were stolen and sold. Their organs, tissues, and limbs were harvested for profit and sold without their consent or the knowledge or permission of their next of kin to be used as decoration or for the amusement of people interested in the macabre.

It is no exaggeration to describe the twisted conduct in this case as a human rights violation, a desecration of societal norms and long-held human notions of right and wrong. This practice violates the human dignity of the deceased and inflicts suffering on their loved ones.

"The notion that the bodies of the dead and their human remains deserve respect and a dignified treatment is common to and deeply embedded within different societal, religious, and cultural traditions. Legal protections governing the treatment of dead bodies have long been established within international humanitarian law, international criminal law, human rights law, and domestic laws. . . .  The treatment of dead bodies is also of concern to international criminal law, which prohibits the mutilation of the dead. Violation of the bodies of the dead is increasingly recognized as an element of crime, as an attack on personal dignity."  United Nations Office of the High Commissioner for Human Rights, Special Rapporteur, Apr. 25, 2024.[7]

"The protection of and respect for the dead is something that makes us human. It's prevalent, since the beginning of humanity, in all cultures and religions and is regulated in religious, cultural and social practices around the world, in national laws and also in International Humanitarian Law that applies in times of war.  The protection of the

---

[7] Available at https://www.ohchr.org/en/calls-for-input/2024/call-input-protection-dead-persons-and-their-human-remains-including-victims, last visited Dec. 20, 2024.

bodies and human remains of deceased persons . . . in many cases affects other rights of the victim and his or her family members. . . . There are a range of rights that are affected when there is no access to the body, when the victim's body is mutilated, destroyed, when their dignity is not respected." Tidball-Binz, Morris, "Protecting and respecting the dead makes us human," July 5, 2024.[8]

"Death does not erase human dignity, either immediately or completely. The consequences of certain acts of self-determination reach beyond death, and command suitable respect. Human rights are rights accruing to the living; they protect and facilitate life itself. It is only possible to speak of rights of the dead in the sense that some acquired legal rights last beyond death, such as the right to be buried. Caring for the dead in a manner appropriate to human dignity is primarily significant for the next of kin. Denying this right means that the next of kin are prevented from making their peace with the loss of an individual who is close to them. Suitable care for the dead is thus a

---

[8] Available at https://www.ohchr.org/en/stories/2024/07/protecting-and-respecting-dead-makes-us-human, last visited Dec. 20, 2024.

right of the living." German Commission for Justice and Peace, "How society cares for the dead – a matter of human dignity!" July 2024.[9]

Finally, the United States acknowledges the suffering of the many families impacted by the Lodges' conduct in support of the 12 month sentence. The conduct in this case strikes to the heart of one of the quintessential human experiences – death and the grieving process. When humans die, their loved ones frequently find solace in the peace they hope we find in death. The theft and sale of these remains for profit is a violation of any notion of peace for the dead and those who love them, and shatters any sense of security they might have felt in the belief that their loved ones were treated with dignity and respect in their final disposition. Their own words support an upward variance:

One spouse wrote:

*For Bridget, donating her body to Harvard was a final gesture of generosity after a life dedicated to education and good works. But because of this scandal, what's left for us is disillusionment, shame, memories that will forever be disturbing and thought that will forever be haunting.*

A friend wrote:

---

[9] Available at https://www.partner-religion-development.org/wp-content/uploads/2024/09/How-society-cares-for-the-dead-%E2%80%93-a-matter-of-human-dignity.pdf, last visited Dec. 20, 2024.

*I loved B.A., and was so proud of her for donating her body to Harvard Medical School. Instead of feeling pride, I now am disgusted and saddened how it turned out. I don't understand why anyone would take advantage and violate her corpse.*

A daughter wrote:

*What Mr. Lodge and the court might not know is that this corruption transcends the bodily level and extends into the realm of memory. It will likely be a long time, if ever, I can look at a picture of my father and not have thoughts like, did he still have his head? did they sell his herculean right hand? were the skin of his tattoos made into cushions? Whether the answer is yes or no is not the issue so much as the families have had to go to that space with the real anxiety and pain such gruesome questions inflict.*

Another wife, writing about a husband lost to a brutal disease, wrote:

*I grieved deeply for my husband of over 32 years-the man with whom I shared more of my life than I had ever lived without. For a time, the loss consumed me, and I struggled to find the will to carry on. It took immense strength to climb out of that despair and begin moving forward. As I sat in the living room, a wave of horror washed over me at the thought that he had been desecrated, his final act of generosity stolen. My boys and I were stripped of the opportunity to honor his selfless nature, but, above all, the world was deprived of vital research. The theft and sale of remains not only robbed individuals but also robbed science of invaluable contributions from every victim whose sacrifice was exploited.*

## C. Assessment of Relevant § 3553(a) Sentencing Factors

The second and final step in the sentencing process is for the Court to consider all applicable factors set forth in Title 18, United States Code, § 3553(a) when fashioning an appropriate, individualized sentence. Here, a sentence of 12 months' imprisonment is necessary.

The facts and arguments outlined above speak to the especially heinous and egregious nature and circumstances of the offense conduct in this case. An incarcerative sentence is necessary to honestly reflect the seriousness of this offense, to promote respect for the law, and to provide just punishment.

Here, the Government's recommendation of a relatively short incarcerative sentence is crafted, in part, based on the mitigating circumstances of Lodge's age, health, and history.

But just punishment also requires a reckoning with the reality of this case. Lodge leans heavily on her own illness in seeking mercy from the Court. Yet, many of the donors in this case donated their bodies in the hopes of helping people who suffer from cancer and other terrible diseases. They received little mercy from Denise and Cedric Lodge. And while she refers to her illness with appropriate sobriety when faced with the possibility of incarceration, it was a point of casual chit-

chat while she was negotiating prices and selections with Andrew

Ensanian.

On May 23, 2018, she wrote:

> *Okay, I need to apologise, I have chemo brain, and*
> *sometimes I miss stuff. I forgot something in the package*
> *this morning. When I realized it, I ran to the post office. It*
> *was the skull chunk. I just sent it off, with some ribs* 😊 *.*
> *Here is that tracking number and it will also be there on*
> *Saturday.*

On February 7, 2019, after Ensanian reviewed pictures of a

dissected face, Denise Lodge arranged for the sale and shipment,

writing:

> *My husband said we will front you the $100 plus shipping? To*
> *be paid in the next 30 days? And we can send it out to you*
> *Late Monday or Tuesday Morning. Sound okay???*

After Ensanian responded in the affirmative, she wrote:

> *I have a few other people, but I still go to you first always. You*
> *have always been so helpful.* 🙃😊🙃

And while she faced financial loss due to her illness, it appears

she received disability income.  PSR ¶ 56.  She did not need to sell body

parts to make money.  Denise Lodge was in the best position to stop her

husband when he started down this path.  Instead, she became his

24

assistant – negotiating prices, packaging body parts, receiving payments. While she characterizes her participation as done reluctantly and with regret, the tone of her messages, riddled with hearts and smiley face emojis, presents a different picture.

Finally, given the widespread nature of this offense, the need for deterrence is paramount. This investigation has uncovered a secretive, nationwide market for human remains, most of which are stolen by people, like Cedric Lodge, who are trusted with human remains. In this case, positive evidence of the thefts was uncovered, and so the perpetrators can be held accountable. But most such transactions occur in the shadows, and the sources of the remains are undisclosed. Despite knowing that "wet specimens" and fetal corpses cannot be obtained legally, the down-market trade cannot be prosecuted as it is in this case without proof that the items are stolen. Thus, it is vital that, in a case where the evidence proves conclusively that the remains were stolen, a message must be sent to this "oddities" community, that the United States does not tolerate the theft and sale of human remains. This dark trade must end.

25

In making its recommendation, the government is mindful of the relative culpability of all of the defendants who engaged in similar conduct in the related cases.  The Government, in recommending a 120-month sentence for Cedric Lodge, acknowledges that he is much more culpable than his wife.  Denise Lodge, however, perpetuated and directly profited from this horrific scheme.  Charitable human beings donated their bodies to Harvard Medical School's Anatomical Gift Program in an effort to assist in the training of medical students and toward medical discoveries.  Cedric Lodge stole their hearts, hands, brains, and faces do be sold for the amusement of the disturbing "oddities" community.  Denise Lodge advertised them for sale, packaged them up, sent them out, and received thousands of dollars in payment. Her conduct shocks the conscience.

## V.    Conclusion

Accordingly, the United States respectfully requests that the Court vary from the otherwise applicable guidelines range and impose a sentence of 12 months of imprisonment.

December 9, 2025                    Respectfully submitted,

                                   BRIAN D. MILLER
                                   United States Attorney

                       By:    /s/ Alisan V. Martin
                              ALISAN V. MARTIN
                              Assistant United States Attorney
                              Attorney I.D. No. PA 316757
                              United States Attorney's Office
                              240 West Third Street, Suite 316
                              Williamsport, PA  17701
                              Telephone:  570-326-1935
                              Email:  Alisan.Martin@usdoj.gov

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CASE NO. 4:23-CR-159-03 |
| v. | : | |
| | : | (C.J. BRANN) |
| DENISE LODGE, | : | |
| Defendant | : | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion as to be competent to serve papers.  That on this Tuesday, December 9, 2025, she served a copy of the attached

## GOVERNMENT'S SENTENCING MEMORANDUM

by electronic means to:
Addressee:
Hope C. Lefeber, Esquire


Dated:  December 9, 2025                    /s/ Alisan V. Martin
                                            ALISAN V. MARTIN
                                            Assistant United States Attorney

28